1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| LNV CORP., a Nevada corporation,<br><br>Plaintiff,<br><br>v.<br><br>STK FINANCIAL, LLC, a California corporation, MICHAEL KREUTZELMAN, and TED KOBAYASHI,<br><br>Defendant. | CASE NO. 11-5744 RJB<br><br>ORDER ON PLAINTIFF'S MOTION<br><br>FOR SUMMARY JUDGMENT |

11
12
13
14
15
16
17
18
19
20
21
22
23
24

This matter comes before the Court on the Plaintiff's Motion for Summary Judgment. Dkt. 38. The Court has considered the pleadings filed in support of and in opposition to the motion and the file herein.

On October 8, 2008, the Bank of Clark County ("BOCC") funded a loan for almost $750,000 (the subject of this dispute) and transferred the proceeds into Defendant STK Financial LLC's account. Dkt. 42-2, at 47. Steven Kobayashi, Defendants Ted Kobayashi's and Michael

1   Kreutzelman's financial advisor, converted the loan funds for his own purposes.  Dkt. 42-2.  The

2   FDIC took over the Bank of Clark County and Plaintiff LNV Corporation ("LNV") acquired the

3   loan at an auction.   LNV now seeks an order summarily granting it a $1,005,396.18 judgment

4   against Defendants Ted Kobayashi and Michael Kreutzelman, based on the loan documents

5   (including personal guarantees) they executed.  Dkt. 38.  The motion should be denied because

6   there are issues of fact as to whether the loan documents were fraudulently executed, and

7   because the shelter and D'Oench doctrines do not bar all defenses asserted.

8                    **I.      BACKGROUND FACTS AND PROCEDURAL HISTORY**

9       **A.  BACKGROUND FACTS**

10          Although this case is about a real estate loan, the personal relationships of the parties

11  involved are relevant.  Defendants Ted Kobayashi and Michael Kreutzelman are business

12  partners in Boster, Kobayashi & Associates, an engineering firm.  Boster, Kobayashi &

13  Associates was started by Tom Boster.  Dkt. 42-2.  Michael Kreutzelman is the son in law of

14  Tom and Roberta Boster.  Dkt. 42-2.  Steven Kobayashi is Ted Kobayashi's son. Dkt. 42-2, at 4.

15  In order to prevent confusion, parties will be referred to by their first names.

16          Steven worked as an Investment Adviser Representative employed by UBS Securities,

17  Merrill Lynch, and Morgan Stanley.  Dkt. 42-2, at 6.  Steven was the personal financial advisor

18  to Tom, Roberta, Ted, and Michael and was also advising Boster, Kobayashi & Associates in its

19  financial matters.  Dkt. 42-2, at 3 and 6.  His services to them included handling investment

20  accounts, and providing tax, retirement, and other financial advice.  Dkt. 42-2, at 6.  Steven

21  testified that after years of working for Ted and Michael, they trusted him, and signed whatever

22  documents he told them to sign.  Dkt. 42-2, at 21.  He states:

23                  Mike and my dad had over time just came to sign documents when I put it in
                    front of them.  Sometimes I would tell them what it was about.  Sometimes I

24

1        wouldn't.  A lot of the documents I gave, sometimes they were duplicates of
       previous documents, a lot of it because UBS had a habit of losing – and other
2        firms had a habit of losing documentation that required other documents.
           Over time . . . and as busy as they were, I would just – we would send
3        documents to the house or the secretaries . . . would send documents to the house
       and they would never get returned.  So it just got to be a habit that I would go
4        personally, drop in when I knew that they were there, call and say, hey, I'm
       coming down.
5            Sometimes there were conversations. Sometimes I just asked them to sign
       here, here, and I would or wouldn't tell them what it was for.  As a result, most of
6        the time it became a routine thing.

7 Dkt. 42-2, at 21.

8      At Steven's behest, Tom and Roberta began estate planning in 1998, to include selling

9 the building housing Boster, Kobayashi & Associates ("building") to Boster, Kobayashi &

10 Associates, Ted and Michael.  Dkt. 42-2, at 3.  Steven explored the possibility of a loan with the

11 Bank of Clark County, and created a limited liability company, "Double K Properties LLC,"

12 through which Ted and Michael could hold title to the building.  Dkt. 42-2, at 7-8.  Steven began

13 arranging for financing with the Bank of Clark County and received a preliminary "term sheet"

14 from it.  Dkt. 42-2, at 9.  However, even as late as 2005, the deal to purchase the building had not

15 been completed.  *Id.,* at 8.  No price had been agreed upon and no sales contract with earnest

16 money was signed.  *Id.*

17      Unbeknown to Ted, Michael, Tom, and Roberta, Steven created a multi-million dollar

18 "Ponzi" scheme, and by 2008, Steven acknowledges that he was "desperate" for money.  Dkt.

19 42-2, at 13.  Steven states that he owed other people millions of dollars at that point.  Dkt. 42-2,

20 at 13.

21      Steven acknowledges that he wanted a "favorable opinion" at the Bank of Clark County, and

22 so pursued a "tight relationship," "tighter than just our friendship and our business relationship,"

23 with BOCC Vice President and Chief Credit Officer David Kennelly.  Dkt. 42-2, at 14.  (Steven

24

ORDER ON PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT- 3

1   was also David's financial advisor).  Dkt. 42-2, at 38.  Accordingly, Steven approached David in

2   August of 2008 with a "consulting agreement" for David to perform services for TNK Financial,

3   LLC, another of Steven's LLCs. Dkt. 42-2, at 14.  In exchange for $5,000 a month, Steven hoped

4   to "get the benefit of the doubt in decisions in which the benefit of the doubt was available."

5   Dkt. 42-2, at 15.  David was paid $15,000 by TNK Financial, LLC pursuant to this agreement.

6   Dkt. 42-2, at 39.

7        Around this time, Steven created another limited liability company, Defendant STK

8   Financial, LLC ("STK"), and changed the entity to which the BOCC loan was being made from

9   "Double K Properties LLC" to STK so that he would have control of the money.  Dkt. 42-2, at

10  11-13.  Ted and Michael were not members of STK.  Dkt. 42-2, at 11.

11       Steven then began to urge the parties to complete the deal to buy and sell the building.  Dkt.

12  42-2, at 11-13.  Steven acknowledges that he presented various loan documents to Ted and

13  Michael to sign regarding the loan with BOCC.  Dkt. 42-2 at 21.  Steven testified that he

14  couldn't remember telling Ted and Michael anything about any of the documents associated with

15  this loan that he presented them.  Dkt. 42-2, at 21.  Steven states that he knew Ted and Michael

16  had such trust in him, they would have just signed any of the documents he put in front of them.

17  Dkt. 42-2, at 21.  Steven acknowledges "creating" or "altering" some of the documents after the

18  signatures were gathered.  Dkt. 42-2, at 21.

19       Ted testified that it was his understanding that at that point, they were filling out paperwork

20  to apply for the loan.  Dkt. 42-2, at 29.  Neither Ted nor Michael remembers signing any of the

21  loan documents in the record.  Dkts. 39-11, at 7 and 39-12, at 8.  Nor do they remember Steven

22  ever telling them anything about the documents they were signing.  *Id.*

23

24

1    The record contains a Promissory Note, for $750,000 with STK as borrower, (which Ted and

2    Michael purportedly signed as members of STK); personal commercial guarantees, and other

3    documents. *See e.g.* Dkt. 39-1, 39-2 and 39-3.

4    Alan Ludlow was the BOCC commercial loan officer originally assigned to the STK loan.

5    Dkt. 42-3.  In late August of 2008, Alan advised Steven that he would need a variety of

6    information and documents including STK's tax returns, balance sheet, income statements,

7    operating agreement, earnest money agreement, a signed commercial lease, and financial

8    information and tax returns for the members of STK.  Dkt. 42-3, at 2.  After receiving only a few

9    of those documents, Alan emailed Steven on September 3, 2008, renewing his requests.  Dkt. 42-

10   3.  Later that day, David, the BOOC loan officer that had a consulting agreement in place with

11   Steven, emailed Steven and told him that he would "rein Alan in."  Dkt. 42-2, at 45.  Shortly

12   after this email exchange, David reassigned the loan to BOCC employee Amaya Urzaa.  Dkt. 42-

13   3, at 3.  Amaya states that when she got the loan, she drafted a credit memo using the real estate

14   as collateral, structuring the loan so that it would close through escrow.  Dkt. 42-2, at 53.  She

15   states that the most unusual thing she remembers about this loan was that David told her that

16   they were not going to require a deed of trust in order to use the building as collateral.  Dkt. 42-2,

17   at 52.  She redrafted the credit memo as David instructed her and in such a way that she did not

18   think that the bank's credit committee review would be required.  Dkt. 42-2, at 54-55.  On

19   September 15, 2008, David approved the credit request for the STK loan.  Dkt. 42-2, at 62.

20   On October 8, 2008, the Bank of Clark County funded the loan for almost $750,000 and

21   transferred the proceeds into Defendant STK's account.  Dkt. 42-2, at 47.  Steven states that he

22   told everyone that the purpose of the loan was to purchase the building, but acknowledges that he

23   "commit[ed] a crime" and wired the money into other accounts "for his own purposes."  Dkt. 42-

24

1   2, at 12.  Steven is now serving a prison sentence in a federal prison in California for unrelated

2   crimes.

3   **B.  PENDING MOTION**

4       LNV now moves for summary judgment in its favor, arguing that: 1) the defenses asserted

5   are barred by the shelter doctrine, 2) Defendants cannot claim fraud in the execution because no

6   one can recall what, if anything, was said to induce them to sign the loan documents; and 3)

7   LNV is entitled to summary judgment against Ted and Michael in the amount of $1,005,396.18.

8   Dkt. 38.

9       Ted and Michael oppose the motion, arguing that: 1) in so far as LNV's claims related to

10  enforcement of the personal guaranties Ted and Michael signed, the shelter doctrine is

11  unavailable because the guarantees were not negotiable instruments and so the asserted defenses

12  are not barred, 2) the defense of fraud in the execution should not be dismissed because it can be

13  established constructively, and 3) BOCC's conspiracy renders the guaranties unenforceable.

14  Dkt. 42.

15      In their reply, LNV argues that Defendants cannot prove fraud in the execution and all

16  defenses should be dismissed pursuant to the common law doctrine announced in *D'Oench,*

17  *Duhme & Co. v. F.D.I.C.,* 315 U.S. 447 (1942).  Dkt. 43.

18      Trial is set to begin on November 13, 2012.  Dkt. 31.

19      This opinion will first address whether the shelter and D'Oench doctrines bar Defendants

20  defenses.  It will then consider whether Defendants can allege sufficient facts to avoid summary

21  dismissal of their fraud in the execution defense.

22                      **II.    <u>DISCUSSION</u>**

23  **A.  SUMMARY JUDGMENT STANDARD**

24

1    Summary judgment is proper only if the pleadings, the discovery and disclosure materials

2    on file, and any affidavits show that there is no genuine issue as to any material fact and that the

3    movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c). The moving party is

4    entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

5    showing on an essential element of a claim in the case on which the nonmoving party has the

6    burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue

7    of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find

8    for the non moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

9    (1986)(nonmoving party must present specific, significant probative evidence, not simply "some

10   metaphysical doubt.").  *See also* Fed.R.Civ.P. 56(e).  Conversely, a genuine dispute over a

11   material fact exists if there is sufficient evidence supporting the claimed factual dispute,

12   requiring a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty

13   Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors

14   Association*, 809 F.2d 626, 630 (9th Cir. 1987).

15       The determination of the existence of a material fact is often a close question.  The court

16   must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

17   e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254, T.W. *Elect.

18   Service Inc.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor

19   of the nonmoving party only when the facts specifically attested by that party contradict facts

20   specifically attested by the moving party.  The nonmoving party may not merely state that it will

21   discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

22   to support the claim.  *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*).

23

24

ORDER ON PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT- 7

1   Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not

2   be "presumed."  *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

3   **B.  SHELTER DOCTRINE**

4       "Under federal law, the FDIC is given holder in due course status and that status is also

5   acquired by its assignees under the shelter doctrine."  *Gossen v. JPMorgan Chase Bank, et. al.*

6   819 F.Supp.2d 1162, 1168 (W.D. Wash. 2001)(*citing Fed. Sav. & Loan Ins. Corp. v. Cribbs*, 918

7   F.2d 557, 559–60 (5th Cir.1990)).  As a general rule under Washington law, "a holder in due

8   course takes a negotiable instrument free from all claims to it on the part of any person, and from

9   all defenses of any party to the instrument with whom the holder has not dealt."  *Id.* (*citing*

10  *Wesche v. Martin*, 64 Wash.App. 1, 8 822 P.2d 812 (1992)).

11      Defendants here argue that the commercial guarantees Ted and Michael signed here are not

12  "negotiable instruments" and so LNV cannot take advantage of the shelter doctrine.  Dkt. 42.

13  Defendants do not dispute that the shelter doctrine applies to their defenses in regard to the note.

14      Under Washington's Uniform Commercial Code ("UCC") a "negotiable instrument" is

15          . . . an unconditional promise or order to pay a fixed amount of money, with or
            without interest or other charges described in the promise or order, if it:
16          (1) Is payable to bearer or to order at the time it is issued or first comes into
            possession of a holder;
17          (2) Is payable on demand or at a definite time; and
            (3) Does not state any other undertaking or instruction by the person promising or
18          ordering payment to do any act in addition to the payment of money, but the
            promise or order may contain (i) an undertaking or power to give, maintain, or
19          protect collateral to secure payment, (ii) an authorization or power to the holder to
            confess judgment or realize on or dispose of collateral, or (iii) a waiver of the
20          benefit of any law intended for the advantage or protection of an obligor.

21  RCW 62A.3-104(a).

22      The commercial guarantees signed by Ted and Michael are not negotiable instruments,

23  and so LNV cannot take advantage of the shelter doctrine.  The guarantees did not contain

24

1   "unconditional" promises or orders for a "fixed amount of money."  In the guarantees, the

2   "Borrower" was STK, the Lender was BOCC, and the Guarantor[s] were Ted and Michael.

3   Dkts. 39-2 and 39-3.  The guarantees provided:

4       CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE. For
        good and valuable consideration, Guarantor absolutely and unconditionally
5       guarantees full and punctual payment and satisfaction of the Indebtedness of
        Borrower to Lender, and the performance and discharge of all Borrower's
6       obligations under the Note and the Related Documents. . . .
        INDEBTEDNESS. The word "Indebtedness" as used in this Guaranty means all
7       of the principal amount outstanding from time to time and at any one or more
        times, accrued unpaid interest thereon and all collection costs  and legal expenses
8       related thereto permitted by law, attorneys' fees, arising from any and all debts,
        liabilities and obligations of every nature or form, now existing or hereafter
9       arising or acquired, that Borrower individually or collectively  or interchangeably
        with  others, owes or will owe Lender. "Indebtedness" includes, without
10      limitation, loans, advances, debts, overdraft indebtedness, credit card
        indebtedness, lease obligations, liabilities and obligations under any interest rate
11      protection agreements or foreign currency exchange agreements or commodity
        price protection agreements, other obligations, and liabilities of Borrower, and
12      any present or future judgments against Borrower, future advances, loans or
        transactions that renew, extend, modify, refinance, consolidate or substitute these
13      debts, liabilities and obligations whether:  voluntarily or involuntarily incurred;
        due or to become due by their terms or acceleration; absolute or contingent;
14      liquidated or unliquidated; determined or undetermined; direct or indirect;
        primary or secondary in nature or arising from a guaranty or  surety; secured or
15      unsecured; joint or several or joint and several; evidenced by a negotiable or non-
        negotiable instrument or writing; originated by Lender or another or others;
16      barred or unenforceable against Borrower for any reason whatsoever; for any
        transactions that may be voidable for any reason (such as infancy, insanity, ultra
17      vires or  otherwise); and originated then reduced or extinguished and then
        afterwards  increased or reinstated.
18
19  Dkt. 39-2, at 2 and 39-3, at 2.  The amount payable is uncertain because it depends on how much

20  has been paid by the Borrower.  Further, it includes a significant number of other items - not just

21  the loan at issue here.  Additionally, as Defendants point out, the guarantees also required that

22  Ted and Michael provide balance sheets, income statements, and tax returns (Dkts. 39-2, at 3 and

23  39-3, at 3), and so requires that Ted and Michael do an "act in addition to the payment of

24  money."  Dkt. 42 (*citing*  RCW 62A.3-104(a)).  Accordingly, the shelter doctrine in not available

1   to bar Ted and Michael's defenses in regard to the guarantees.  To the extent that Plaintiff's

2   move to summarily dismiss Ted and Michael's defenses regarding the guarantees based on the

3   shelter doctrine, the motion should be denied.

4   **C.  D'OENCH DOCTRINE**

5       In its reply, Plaintiff moves for dismissal of all Defendants claims, arguing that under the

6   common law D'Oench doctrine, all Defendants defenses are barred.  Dkt. 43.

7       "Under D'Oench, Duhme and its progeny, borrowers cannot assert an unrecorded side

8   agreement with a failed bank as a defense to their liability on a note held by the FDIC."

9   *Resolution Trust Corp. v. Miller*, 67 F.3d 308 (9th Cir. 1995).  The D'Oench doctrine was

10  codified, in part at 12 U.S.C. § 1823(e).  *Resolution Trust Corp. v. Kennelly*, 57 F.3d 819, 822 n.

11  3 (9th Cir. 1995) (citing *D'Oench, Duhme & Co. v. F.D.I.C.,* 315 U.S. 447 (1942)).  Plaintiff

12  states, however, that it is not asserting any "rights, powers or privileges" granted to the FDIC or

13  them under the Financial Institutions Reform, Recovery and Enforcement Act of 1989

14  ("FIRREA") or the Federal Deposit Insurance Act including those under 12 U.S.C. §§ 1821(d),

15  1823(e), and 1825.  Dkt. 43, at 9.

16      To the extent Plaintiff's motion for summary judgment is based on the D'Oench doctrine, it

17  should be denied.  First, Plaintiff raises the issue for the first time in the reply, not affording the

18  Defendants an opportunity to respond.  Second, Plaintiff makes no showing that the D'Oench

19  doctrine applies to the defense of fraud in the execution or fraud in the factum.  Plaintiff in its

20  original motion, state that the D'Oench doctrine does not bar claims of fraud in the execution or

21  fraud in the factum.  Dkt. 38, at 13 n. 5.  Defendants here assert and allege facts to support a

22  finding of fraud in the execution/factum, so the motion for summary judgment should be denied.

23  Third, the Ninth Circuit has stated that "[t]here is serious doubt whether D'Oench, Duhme

24

1   survives *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994)."

2   *Resolution Trust Corp. v. Kennelly*, 57 F.3d 819, 822 n. 3 (9th Cir. 1995).  Plaintiff makes an

3   insufficient showing that the common law D'Oench doctrine bars all defenses here and so they

4   have not shown that they are entitled to a judgment as a matter of law.  Its motion for summary

5   judgment should be denied.

6   **D.  FRAUD IN THE EXECUTION/FACTUM**

7   In order to understand the fraud defense asserted here, it is important to understand the

8   distinction between "fraud in the inducement" and "fraud in the execution," (also called "fraud in

9   the factum").  Fraud in the inducement "induces a party to assent to something he otherwise

10  would not have." *Southwest Administrators, Inc. v. Rozay's Transfer*, 791 F.2d 769 (9th Cir.

11  1986).  Fraud in the execution "induces a party to believe the nature of his act is something

12  entirely different than it actually is." *Id.* (*citing* 12 Williston on Contracts § 1488, at 332 (3d ed.

13  1970)).  "Fraud in the execution arises when a party executes an agreement with neither

14  knowledge nor reasonable opportunity to obtain knowledge of its character or its essential

15  terms."  *Id.* (*quoting* Uniform Commercial Code § 3-305(2)(c); see Restatement (Second) of

16  Contracts § 163 (1981)).  Where there is fraud in the execution, the transaction is void.

17  Restatement (Second) of Contracts § 163 (1981), Comment C (1981).

18  Washington Courts apply the following definition of fraud in the execution:

19       If a misrepresentation as to the character or essential terms of a proposed contract
20       induces conduct that appears to be a manifestation of assent by one who neither
         knows nor has reasonable opportunity to know of the character or essential terms
         of the proposed contract, his conduct is not effective as a manifestation of assent.

21
22  *Pedersen v. Bibioff*, 64 Wn.App. 710, 722 (1992)(*citing* the Restatement (Second) of Contracts §

    163 (1979)).  In contrast, fraud in the inducement "is fraud which induces the transaction by
23
    misrepresentation of motivating factors such as value, usefulness, age or other characteristic of
24

ORDER ON PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT- 11

1   the property or item in question." *Id.*  In any event, fraud must be proven by "clear, cogent, and

2   convincing evidence." *Id.*, at 722-723.

3       Plaintiff's motion to summarily dismiss Defendants' defense of fraud in the execution

4   should be denied.  Defendants have pointed to sufficient issues of fact as to whether Steven made

5   "misrepresentations as to the character or essential terms of the contracts" at issue here and

6   whether Ted and Michael "knew or had reasonable opportunity to know of the character or

7   essential terms" of those contracts.

8       As to whether Steven made "misrepresentations as to the character or essential terms of

9   the contracts," Plaintiff argues that Defendants cannot remember what Steven said to get them to

10  sign those documents, and so can't show a "misrepresentation."  Dkts. 38 and 43.  Defendants

11  properly point out that as their financial advisor, Steven had a fiduciary duty to affirmatively

12  disclose all material facts about the documents he was having Ted and Michael sign.  Dkt. 42

13  (*citing* Rule 203-A of the Securities and Exchange Act, 17 C.F.R. § 203A-3.  Further, Ted and

14  Michael had agreed to let Steven be their agent in the deal, including handling the details with

15  the bank.  Defendants point out that Steven had a duty to disclose all material facts regarding

16  these documents and his failure to do so is a misrepresentation.

17          The suppression of a material fact which a party is bound in good faith to disclose
            is equivalent to a false representation.  Where the law imposes a duty on one party
18          to disclose all material facts known to him and not known to the other, silence or
            concealment in violation of this duty with the intent to deceive will amount to a
19          fraud as being a deliberate suppression of the truth and equivalent to the assertion
            of a falsehood.  The concealment of a fact which one is bound to disclose is an
20          indirect representation that such fact does not exist, and constitutes fraud.

21  *Oates v. Taylor*, 31 Wn.2d 898, 902 (1948).  If viewed in a light most favorable to Defendants,

22  there is sufficient evidence to prove by clear, cogent, and convincing evidence in the record that

23

24

1  Steven failed to disclose material facts regarding the documents he had Ted and Michael sign in

2  relation to this loan.  Michael testified that:

3          Once the trust and the confidential relationship grew – especially working with
        the father of Steve Kobayashi, and then his partner, which is my father-in-law,
4          Tom Boster – overtime, it became more of a – it wasn't all the time, but a
        customary thing where he didn't announce that he was coming, and would come
5          into [my office] and say – you know, he may make a general comment, and I
        would sign.

6  Dkt. 42-2.

7  As Defendants point out, the record shows that Steven did not disclose that the loan documents

8  were being signed for anything but a loan commitment, that the loan was going to close outside

9  escrow, that the loan was not going to be secured by a deed of trust recorded against the Boster

10 Building, or that the proceeds obtained would be used for anything other than acquiring the

11 Boster Building.  There are material facts as to whether Steven made misrepresentations by

12 omissions.

13         Further, because of their fiduciary relationship, there are issues of fact as to whether Ted

14 and Michael "knew or had reasonable opportunity to know of the character or essential terms" of

15 the documents that they signed.  In Washington,

16         A party generally cannot escape the duty of reading the documents (the duty to
        "investigate" by simply reading the documents in order to know their contents) in
17          the absence of a showing that he or she was unable to read or understand the
        language used, that there was a special relation of trust and confidence in the
18          representing party, that some artifice was employed to obtain his or her signature,
        or that something was done to prevent his or her reading the document.

19
   *Skagit State Bank v. Rasmussen*, 109 Wash.2d 377, 385 (1987).
20
          Ted and Michael had a "special relation of trust and confidence" with Steven, Ted son, and
21
   both men's financial advisor for over 15 years.  As Defendants properly point out, as their
22
   financial advisor and agent in the deal, Steven had a fiduciary duty to affirmatively disclose all
23
   material facts about the documents he was having Ted and Michael sign.  Dkt. 42 (*citing* Rule
24

1   203-A of the Securities and Exchange Act, 17 C.F.R. § 203A-3.  They trusted him and there is

2   no showing that that trust was unreasonable.

3       **E.  CONCLUSION**

4       Plaintiff's motion for summary judgment should be denied.  The shelter doctrine does not

5   apply to all the documents at issue.  The D'Oench doctrine does not bar all defenses.  Further,

6   there are issues of fact as to Defendants' defense of fraud in the execution.  Plaintiff has not met

7   its burden to show that it is entitled to a judgment as a matter of law.

8                                **III.    ORDER**

9       Therefore, it is hereby **ORDERED** that:

10          •   Plaintiff's Motion for Summary Judgment (Dkt. 38) is **DENIED**.

11      The Clerk is directed to send uncertified copies of this Order to all counsel of record and

12  to any party appearing pro se at said party's last known address.

13      Dated this 31st day of October, 2012.

14

15

16      ROBERT J. BRYAN
        United States District Judge

17

18

19

20

21

22

23

24